UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

SANJAY DUTT,

                    Plaintiff,           17 Civ. 5855

    -against-                   OPINION

YOUNG ADULT INSTITUTE, INC. and
GEORGE CONTOS,

                    Defendants.

----------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        KRAUSS PLLC
        41 Madison Avenue, Suite 4102
        New York, NY 10010
        By: Geri S. Krauss, Esq.



        Attorneys for Defendants

        CLIFTON BUDD & DEMARIA, LLP
        350 Fifth Avenue, Suite 6110
        New York, NY 10118
        By: Daniel C. Moreland, Esq.
            Stephen P. Pischl, Esq.

**Sweet, D.J.**

Defendants Young Adult Institute, Inc. ("YAI") and
George Contos ("Contos") (collectively, the "Defendants") have
moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure to dismiss with prejudice the first, second, seventh,
and eighth causes of action of the amended complaint ("Amended
Complaint") of the plaintiff, Sanjay Dutt (the "Plaintiff" or
"Dutt") arising out of his termination as Executive Vice
President of YAI on April 20, 2016. Based upon the conclusions
set forth below, the motion of the Defendants is granted as to
the second cause of action, and denied as to the first, seventh,
and eighth causes of action.

## I. **Prior Proceedings**

Plaintiff filed his initial complaint on August 2,
2017. ECF No. 1. After the filing by the Defendants of a first
motion to dismiss on October 17, 2017, *see* ECF No. 15, the
Amended Complaint was filed on November 7, 2017, *see* ECF No. 19,
mooting the first motion to dismiss. Defendants then filed the
instant motion to dismiss the first, second, seventh, and eighth
causes of action on December 4, 2017, which was heard and marked
fully submitted on February 21, 2018. ECF No. 23.

2

The Amended Complaint alleges claims of discrimination
and retaliation against Dutt due to his race, color, national
origin and age in violation of Sections 1981 and 1983 of the
Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 20003 *et seq.* ("Title
VII"), the New York State Human Rights Law, New York Executive
Law § 296 *et seq.* (the "State Law"), and the Administrative Code
of the City of New York § 8-107 *et seq.* (the "City Law"); breach
of contract and retaliation in violation of YAI's Code of
Conduct (the "Code of Conduct"), a Corporate Integrity Agreement
it entered into as part of a settlement and dismissal of
Medicaid fraud claims brought against it by federal and state
authorities (the "CIA"), and New York law; and other related
claims. Am. Compl. ¶ 1, ECF No. 19.

Specifically, the Amended Complaint alleges eight
causes of action: (1) breach of contract, detrimental reliance,
and retaliation as against YAI, *see id.* ¶¶ 61-73; (2) breach of
third-party beneficiary obligations as against YAI, *see id.* ¶¶
74-80; (3) discrimination under Section 1981 as against YAI and
Contos based on Dutt's Indian heritage, *see id.* ¶¶ 81-54; (4)
discrimination under Title VII as against YAI, *see id.* ¶¶ 85-96;
(5) discrimination under State Law as against YAI and Contos,
*see id.* ¶¶ 90-96; (6) discrimination under City Law as against

YAI and Contos, *see id.* ¶¶ 97-104; (7) breach of contract and obligation of good faith as against YAI, *see id.* ¶¶ 105-116; and (8) tortious interference with contract and/or prospective business relations as against Contos, *see id.* ¶¶ 117-124.

## II. **The Facts**

The Amended Complaint sets forth the following facts, which are assumed true for the purpose of this motion to dismiss. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Plaintiff was hired by YAI, a not-for profit health and human services agency serving individuals with developmental and learning disabilities and their families, to be its Chief Financial Officer ("CFO") on June 25, 2012, at a salary of $250,000. *See* Am. Compl. ¶¶ 11, 13. In 2015, Dutt was promoted to assume the role of Executive Vice President, in addition to continuing his duties as CFO, and his salary was increased to $280,000. *Id.* ¶ 27.

At the time Dutt was promoted, YAI was operating pursuant to the terms of a five-year Corporate Integrity Agreement it had entered into on January 18, 2011 with the New

York State Office of the Medicaid Inspector General ("OMIG") in connection with the settlement of claims by federal and state authorities that YAI had knowingly presented, or caused to be presented, false claims to the Medicaid program (the "Medicaid Fraud Settlement"). *Id.* ¶¶ 14, 15. The CIA set forth detailed mandatory and affirmative compliance obligations that YAI was required to follow regarding systems, processes, procedures, controls, and expertise to ensure accuracy in its reports to the Medicaid Program. *Id.* ¶ 19. Pursuant to the CIA, YAI was also required to establish a written Code of Conduct to be distributed to all officers, directors, and employees of YAI (the "Covered Persons"), and which required, at a minimum, to mandate that all Covered Persons (i) comply with the policies and procedures implemented pursuant to the CIA, (ii) report any suspected illegal activity or violations of the Code of Conduct or other policies and procedures implemented pursuant to the CIA, (iii) were subject to consequences for a failure to report any such noncompliance, and (iv) had the right to be protected from non-retaliation, non-intimidation and non-harassment for any such reports. *Id.* ¶¶ 20-22. The Code of Conduct also required YAI to retain an Independent Review Organization ("IRO") to ensure that it was complying with all of its obligations. *Id.* ¶ 19.

In compliance with the CIA and as an integral part of its Compliance and Ethics Program, YAI adopted the required Code of Conduct. *Id.* ¶ 25. It provides:

> YAI prohibits all forms of retaliation, intimidation, and harassment against an individual who makes a good-faith report of known or suspected non-compliance with the Code of Conduct, the Personnel Practices Manual, a YAI policy or procedure or an applicable law or regulation. YAI will not penalize any individual making such a report. YAI will take appropriate disciplinary action against anyone who penalizes or intimidates an individual for reporting such a concern in good faith.

*Id.* ¶ 25. The Code of Conduct further requires each employee to:

> [R]eport promptly any actual or suspected violation of the Code of Conduct, PPM, a YAI policy or procedure, or applicable law or regulation to your immediate supervisor, management staff, or the Compliance Officer. This includes actual or suspected violations by anyone you supervise. It also includes actual or suspected violations [by] anyone outranking you. This includes Agency officers and trustees. You must also report violations that you know or suspect will occur in the future.

*Id.* ¶ 24.

A key component of Dutt's job when he was hired was to ensure that YAI scrupulously complied with these compliance obligations and ensured the accuracy of YAI's Medicaid reimbursement submission. *Id.* ¶ 26. Plaintiff alleges that during his tenure at YAI, he was a dedicated, hard-working and highly regarded employee. *Id.* ¶ 27. YAI acknowledged Dutt's value, and in particular his importance to the compliance

6

program, in a letter by its attorneys dated November 23, 2015 to OMIG (the "OMIG Letter"). *Id.* ¶ 28. YAI advised OMIG that it was developing retention agreements to offer Plaintiff and two other senior executives guaranteed employment for a fixed term, subject to traditional bases for termination for cause, and that the three executives would qualify for a one-time, special retention bonus by remaining at YAI through the agreed-upon term. *Id.* ¶ 29. In the OMIG Letter, YAI indicated that the reason for this offer was to assure OMIG that YAI understood the need to retain senior executives and promote organizational continuity and oversight by individuals who had long-standing experience at YAI and who were attuned to its culture. *Id.* ¶ 28.

Shortly thereafter in mid-November 2015, Contos, the CEO of YAI, *id.* ¶ 2, extended to Plaintiff the offer as described to OMIG, further specifying that the contract would be for two years and for more money than his present salary. *Id.* ¶ 31. Dutt understood that Contos was making the offer on behalf of and with the knowledge, approval, and authority of the Board of Directors of YAI (the "Board"). *Id.* ¶ 32. Plaintiff immediately accepted the offer. *Id.* ¶ 33.

Around the same time, Dutt and a group of 11 senior and executive level managers (the "Group") became extremely

7

concerned that YAI was not complying with its obligations under the CIA and its compliance program. *Id.* ¶ 34. Plaintiff alleges that these concerns were apparent from the serious deficiencies in the manner in which YAI was being governed and managed by Jeffrey Mordos ("Mordos"), YAI's Board Chairman, and Contos. *Id.* ¶ 35. Mordos and Contos had taken actions contrary to the CIA requirements, which the Group believed were so improper and ill-advised that the fiscal stability of YAI and the quality of the services it provided to those it served were at serious risk, and that such behavior "severely compromised" the corporate compliance program. *Id.*

The actions, and failures to act, taken by Mordos and Contos resulted in, among other things: (i) the loss of YAI's largest affiliate and nearly $60 million in revenue and the potential loss of others; (ii) the departure of members of the leadership team; (iii) the hiring of consultants and vendors without compliance with the Procurement and Bidding Policy and Procedure that was implemented as a result of the recommendations of the IRO under the CIA and/or YAI's own policies and vetting procedures, which resulted in the hiring of friends of Mordos and Contos who lacked qualifications for the jobs; (iv) improper billing of personal, excessive, and impermissible expenses to YAI; (v) decision-making without input

8

from senior and executive management; and (vi) the reduction of the Board from 21 members to only 9, which made it difficult to fulfill its functions. *Id.* ¶ 36.

Dutt believed that it was his obligation under the CIA and the Code of Conduct to report these concerns to YAI. *Id.* ¶ 38. The Group prepared a letter (the "Managers Letter") and presentation for the Board, and then set up a meeting to discuss these issues with Contos (the "Meeting"). *Id.* ¶¶ 37, 39. Dutt attended the Meeting on December 16, 2015. *Id.* ¶ 42. In participating in the Group and reporting these concerns, Dutt expressly relied on the non-retaliation provisions mandated under the CIA and the Code of Conduct. *Id.* ¶ 38. At the meeting, Contos' reaction was hostile and negative. *Id.* ¶ 43.

Following the Meeting, Contos, in complete contravention of the mandated non-retaliation protections in the CIA and the Code of Conduct, immediately commenced a campaign of retaliation against Dutt and other Group members. *Id.* ¶¶ 44-46. Plaintiff alleges that this campaign consisted of intimidation, retaliation, and inducements to prevent the senior executive officers from further pursuing these compliance and management issues with the Board or OMIG. *Id.* ¶ 44. As a result, the Managers Letter was never presented to the Board or OMIG. *Id.*

Plaintiff alleges that Contos then ceased his campaign
of retaliation against certain white members of the Group, who
were even awarded with raises, but continued to retaliate
against the non-white members of the Group. *Id.* ¶ 45. Contos
targeted Dutt, ultimately ending in his demeaning termination.
*Id.* From the date of the December meeting on, Contos completely
cut Dutt out of the management of YAI, refused Dutt's requests
for meetings, and instead met directly with the managers who
reported to Dutt. *Id.* ¶ 46. Contos never delivered the written
draft of the promised contract. *Id.*

However, Contos was constrained from immediately
terminating Dutt, Plaintiff alleges, as the five-year period of
OMIG oversight required under the CIA had not yet ended, and
such a firing would likely be a violation and mandate an
extension of the agreement. *Id.* ¶ 47. As Plaintiff alleges,
because the Managers' Letter had been prevented from reaching
the Board or OMIG, the CIA and the required oversight terminated
as scheduled in January 2016. *Id.* ¶ 49. The Code of Conduct,
which included the reporting obligations and the non-retaliation
provisions that YAI had been required to put into place under
the CIA, remained binding. *Id.*

Contos allegedly became less constrained with his actions toward Dutt and with the purported commitments to diversity, organizational continuity, and oversight by individuals who had a long-standing experience at YAI. For example, at a meeting in February 2016, Contos stated his intention to "change the culture of YAI" by "bringing in younger people," specifically as to "senior leadership." *Id.* ¶ 50. On another occasion, Contos told Dutt that he wanted to get rid of all the "old timers." *Id.* ¶ 51. In another instance, Contos assigned a technology project to a relatively new white employee who had no expertise in technology while such assignments traditionally should have gone through Dutt. *Id.* ¶ 53. On April 15, 2015, Contos fired the Chief Information Officer ("CIO") without any consultation with Dutt, who was the CIO's supervisor. *Id.* When Dutt asked what the performance issues were that prompted the CIO's firing, Contos stated that "he would not get into it." *Id.*

Finally, on April 20, 2015, Contos fired Dutt. *Id.* ¶ 54. Specifically, the Human Resources Director called Dutt at 6:00 am and informed him of his termination, and that Dutt was no longer permitted to come into the office. *Id.* Dutt was given no reason or notice for his termination. *Id.* Dutt was offered a minimal severance package. *Id.*

11

Dutt alleges that he was treated disparately and far worse than former white employees, even as compared to employees who had cost the firm millions of dollars. *Id.* ¶ 56. For example, YAI entered the Medicaid Fraud Settlement as against its former CFO for $18,000,000, and the white CFO was never fired but was in fact promoted and her salary raised to over $250,000. *Id.* ¶ 57. YAI also retained another white employee who cost the company over $2 million for failing to bill properly. *Id.* Moreover, other white executive-level employees and some junior white employees who had been terminated received a severance package in higher amounts than Dutt was offered. *Id.* ¶ 58.

Finally, after Dutt was terminated, he was replaced with a white employee who Plaintiff alleges was less experienced and less qualified. *Id.* ¶ 59.

## III. **The Applicable Standard**

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). A complaint must contain "sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"
*Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (quoting *Twombly*, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

While "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" *Munoz-Nagel v. Guess, Inc.*, No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); *Williams v. Calderoni*, 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a

13

legally cognizable right of action." *Twombly*, 550 U.S. at 555
(citation and internal quotation omitted).

In considering a motion to dismiss, "a district court
may consider the facts alleged in the complaint, documents
attached to the complaint as exhibits, and documents
incorporated by reference in the complaint." *DiFolco v. MSNBC
Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

## IV. **The Defendants' Motion to Dismiss is Granted in Part, and Denied in Part**

### a. The Defendants' Motion to Dismiss the Breach of Contract Claim is Denied (First Cause of Action)

Plaintiff argues that, under New York law, a claim for
breach of contract may be based on policies contained in
employment handbooks, manuals, and codes of conduct that limit
the employer's right to termination, even in an at-will
employment relationship. *See* Pl.'s Br. 7 (citing *Baron v. Port
Auth. of New York & New Jersey*, 271 F.3d 81 (2d Cir. 2001)
("This presumption [of an at-will relationship] can be rebutted
. . . by establishing an 'express limitation in the individual
contract of employment' curtailing an employer's right to

14

terminate at will."). Plaintiff contends that the express
written policy setting forth the reporting and non-retaliation
obligations on which Plaintiff's claim rests is contained in
both the Code of Conduct and the CIA, *see* Am. Compl. ¶¶ 20-25,
that Plaintiff was aware of the policy and had to sign a
separate certification stating that he agreed to abide by it,
*see id.* ¶ 23, and that he relied on the non-retaliation
provisions in taking the actions that resulted in the Managers'
Letter, *see id.* ¶ 38. As such, Dutt asserts that he has
sufficiently alleged a breach of contract claim to withstand the
present motion.

        Defendants argue that "an employer's failure to follow
its own internal policies cannot form the basis of a breach of
contract claim, unless an employee can show both the employer
and employee's mutual assent to enter into an implied-in-fact
contract." Defs.' Br. 12 (citing *Maas v. Cornell*, 94 N.Y.2d 87
(1999)). As the Code of Conduct is not a binding contract,
Defendants assert, and rather is "clear and unambiguous" in
stating that all YAI employees are employed at will, Plaintiff
has failed to state a claim for breach of contract. *Id.* at 13.
Moreover, Defendants assert that the Code of Conduct
incorporates by reference the Personnel Practices Manual ("PPM")
in stating that "[t]he standards of the Code do not replace the

                                15

standards contained in the PPM and all other YAI policies and procedures," and defers to the PPM as the controlling policy statement. Defs.' Br. 11. Defendants contend that the PPM provides in relevant part that:

> Neither this manual nor any other agency document confers any contractual right, either expressed or implied, for an employee to remain in the agency's employ. In accordance with our customary practice, all agency employees are employed at will. This means that both YAI/NIPD and the employee are free to terminate the employment relationship at any time for any reason not prohibited by law. This employment at will relationship can only be altered or modified by the Board of Directors.

*See id.* (citing YAI Employee Handbook; Moreland Decl., Ex. B at 2). Defendants argue that, as a matter of law, the PPM's disclaimer is fatal to any claim for breach of contract. *Id.* at 14.

To assert a breach of contract claim based on policies contained in employment handbooks, manuals, or codes of conduct, a plaintiff must prove that "(1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment." *Baron v. Port Auth. of New York & New Jersey*, 271 F.3d 81, 85 (2d Cir. 2001) (citing *Lobosco v. New York Tel.*, 96

N.Y.2d 312, 316, 727 N.Y.2d 383, 751 N.E.2d 462 (2001)). This is
a "difficult pleading burden," *Sabetay v. Sterling Drug, Inc.*,
69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987), and
"[r]outinely issued employee manuals, handbooks and policy
statements should not lightly be converted into binding
employment agreements." *See Lobosco*, 96 N.Y.2d at 317 (emphasis
and footnote omitted); *see also De Petris v. Union Settlement
Ass'n*, 86 N.Y.2d 406, 410, 633 N.Y.S.2d 274, 657 N.E.2d 269
(1995) ("Mere existence of a written policy, without the
additional elements . . ., does not limit an employer's right to
discharge an at-will employee or give rise to a legally
enforceable claim by the employee against the employer."").
Defendants dispute only the first element of this breach of
contract claim.

Here, the Code of Conduct sets out an express written
policy limiting YAI's right of discharge, as required by the
CIA, separate and apart from the language found in the PPM. As
such, the PPM clause noted above did not disclaim the non-
retaliation language found in the Code of Conduct, but rather
stated supplemental information that does not conflict with the
PPM. Plaintiff has plausibly alleged an implied breach of
contract claim to withstand dismissal at this time.

17

The following allegations are worth restating to assist with this analysis. The CIA, which YAI entered into with OMIG in connection with the Medicaid Fraud Settlement on January 18, 2011, constituted a valid and binding contract and component of settlement between YAI and OMIG set to last at least five years. *See* Am. Compl. ¶¶ 14-17. The CIA set forth detailed mandatory and affirmative compliance obligations YAI was required to follow until at least January 18, 2016, including establishing a written Code of Conduct to be distributed to and signed by YAI's officers, directors and employees. *Id.* ¶¶ 14, 19, 21-22. Pursuant to the CIA, YAI's Code of Conduct was required to state that all employees "(i) comply with the Policies and Procedures implemented pursuant to the CIA, (ii) report any suspected illegal activity or violations of the Code of Conduct . . . implemented pursuant to the CIA, (iii) were subject to consequences for a failure to report any such non-compliance, and (iv) had the right to be protected from non-retaliation, non-intimidation and non-harassment for any such reports." *Id.* ¶ 22. YAI did not have the right to amend, change, modify, or abandon any of the obligations imposed under the CIA and amendments to the CIA could only be made with the written consent of OMIG. *Id.* ¶ 18.

The Code of Conduct, established by YAI in order to

remain in compliance with the mandatory CIA, accordingly

requires each employee to:

> report promptly any actual or suspected violation of
> the Code of Conduct, PPM, a YAI policy or procedure,
> or applicable law or regulation to your immediate
> supervisor, management staff, or the Compliance
> Officer. This includes actual or suspected violations
> by anyone you supervise. It also includes actual or
> suspected violations [by] anyone outranking you. This
> includes Agency officers and trustees. You must also
> report violations that you know or suspect will occur
> in the future.

*Id.* ¶ 24 (citing Code of Conduct, Part Two, § 1). The Code of

Conduct further provides the following, as mandated by the CIA:

> YAI prohibits all forms of retaliation, intimidation,
> and harassment against an individual who makes a good-
> faith report of known or suspected non-compliance with
> the Code of Conduct, Personnel Practices Manual, a YAI
> policy or procedure or an applicable law or
> regulation. YAI will not penalize any individual
> making such a report. YAI will take appropriate
> disciplinary action against anyone who penalizes or
> intimidates an individuals for reporting such a
> concern in good faith.

*Id.* ¶ 25 (citing Code of Conduct, Part Two, § 3.)


By contrast, the PPM, which is YAI's personnel policy

manual and is unrelated to the binding CIA agreement YAI made

with OMIG pursuant to the Medicaid Fraud Settlement, provides in

relevant part that:

> Neither this manual nor any other agency document
> confers any contractual right, either expressed or
> implied, for an employee to remain in the agency's

19

employ. In accordance with our customary practice, all
agency employees are employed at will. This means that
YAI/NIPD is free to terminate the employment
relationship at any time for any reason not prohibited
by law. Only the Board of Directors can modify this
employment at will relationship.

YAI Employee Handbook, Moreland Decl., Ex. E at 1.

Defendants argue that the PPM's contrary language
serves as a disclaimer of the Code of Conduct's protections from
retaliation such that the aforementioned clauses in the Code of
Conduct necessarily cannot constitute an express written policy.
Defendants point to *Baron v. Port Auth. of New York & New
Jersey*, 271 F.3d at 88, in which the Second Circuit held that
"where a sufficiently unambiguous disclaimer, conspicuously
placed in the employee handbook such that the employee
reasonably could be expected to read it is at issue, the
totality of the circumstances inquiry is unnecessary; the
implied contract claim may be dismissed as a matter of law."
Defs.' Br. 12. Defendants argue that language in the PPM
expressly disclaims YAI's contractual rights and obligations as
listed in the Code of Conduct.

However, nothing less than a "sufficiently unambiguous
disclaimer" prompts this conclusion. *Baron*, 271 F.3d at 88. In
all other instances, "the trier of facts will have to consider

20

the totality of the circumstances, including the writings, the situation, the course of conduct of the parties and their objectives" to determine whether the presumption of an at-will relationship is overcome, *id.* (citing *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 88 (2d Cir. 1998)), such that granting a motion to dismiss would be inappropriate.

As to determining whether a dismissal is "sufficiently unambiguous," the *Baron* Court found that none of the writings identified by the parties in that case "constitute[d] a written express limitation on the Port Authority's right to hire, fire, promote, demote, transfer or take any other employment action . . . deemed otherwise appropriate." *Id.* at 85. Rather, the Court found that the disclaimer stated that the Guidebook within which it could be found was a "guide to help" employees, and that it was "not intended to create any rights or presumptions," was "solely for internal Port Authority guidance," and did not "impose any standards or obligations." *Id.* at 86.

Here, the PPM language is not "sufficiently unambiguous" to warrant dismissal of this claim on this motion. To begin, the extent that this disclaimer applies to YAI's freedom "to terminate the employment relationship at any time" is limited to reasons "not prohibited by law." YAI Employee

21

Handbook, Moreland Decl., Ex. E at 1 ("This means that both YAI/NIPD and the employee are free to terminate the employment relationship at any time for any reason not prohibited by law."). For purposes of this motion, the CIA constitutes a valid and binding contract, and Defendants' allegedly retaliatory firing of Dutt may have been prohibited by the law of the agreements entered into pursuant to the Medicaid Fraud Settlement. Accordingly, this limitation in the PPM's language creates ambiguity that warrants discovery and denial of Defendants' motion to dismiss Plaintiff's breach of contract claim. *See Baron*, 271 F.3d at 88.

b. The Defendants' Motion to Dismiss Plaintiff's Third-Party Beneficiary Claim Against YAI is Granted

Plaintiff alleges that he is a third-party beneficiary of the binding agreement entered into between YAI and OMIG, and that Defendants' breach of that agreement entitles Dutt to recover. Pl.s' Br. 18-19. Plaintiff argues that the non-retaliation, non-intimidation and non-harassment requirements in the CIA were intended to benefit and protect Covered Persons like him so as to ensure compliance with YAI's reporting obligations, which made up a key component of the CIA. Am. Compl. ¶ 77.

Defendants contend that neither Dutt nor any other YAI employees are the intended beneficiary of the agreement between YAI and OMIG, such that none of them may seek enforcement of the CIA as third-party beneficiaries. Defs.' Br. 17.

Under New York law, "[a] nonparty to a contract may maintain a cause of action alleging breach of contract only if it is an intended, and not a mere incidental, beneficiary of the contract." *Bd. of Managers of 100 Congress Condominium v. SDS Congress, LLC*, 152 A.D.3d 478, 480, 59 N.Y.S.3d 381 (N.Y. App. Div. 2017). A party asserting rights as a third-party beneficiary must allege: "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for its benefit, and (3) that the benefit to it is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate it if the benefit is lost." *Id.* (citing *Nanomedicon, LLC v. Research Found. of State Univ. of N.Y.*, 112 A.D.3d 594, 596 (2013)); *see also Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 162 (S.D.N.Y. 1998) (citation and quotation marks omitted) (noting that although a "party need not necessarily be specifically mentioned in a contract to be considered a third-party beneficiary, the parties intention to benefit the third party nonetheless must be revealed on the face

of the agreement."). However, "[a] third party beneficiary is an intended beneficiary where either (1) 'no one other than the third party can recover if the promisor breaches the contract,' or (2) 'the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party.'" *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 162 (S.D.N.Y. 1998).

Here, OMIG maintained the contractual right, pursuant to the CIA, to recover if YAI breached the agreement or failed to comply with certain obligations. *See* CIA, ECF Dkt. No. 24, Ex. F at 22 ("YAI and OMIG hereby agree that failure to comply with this CIA may lead to the imposition of the monetary penalties ('Stipulated Penalties') set forth below."). Therefore, because it is not true that "no one other than [Dutt] can recover if [YAI] breaches the contract," Dutt cannot be an intended beneficiary of the CIA. *See Piccoli A/S*, 19 F. Supp. 2d at 162. Accordingly, Defendants' motion to dismiss Plaintiff's second cause of action is granted.

c. The Defendants' Motion to Dismiss Plaintiff's Claim for
   Breach of Contract and Obligations of Good Faith is
   Denied

In his seventh cause of action, Plaintiff alleges that his acceptance of Contos' November 2015 verbal offer for two years' guaranteed employment as CFO and Executive Vice President at an annual salary of $280,000 resulted in a fully binding type one preliminary agreement. *See* Pl.'s Br. 20-21; Am. Compl. ¶¶ 112-13. In the alternative, Plaintiff asserts that his acceptance of the above resulted in a type two preliminary agreement requiring YAI to continue to negotiate with him in good faith. *Id.*

Defendants argue that YAI has expressly provided that the at-will employment relationship of its employees can only be modified by its Board, and that oral assurances are insufficient to alter an at-will relationship as a matter of law. Defs.' Reply Br. 6.

"The Second Circuit recognizes two types of preliminary agreements: agreements that are 'fully binding,' where the parties have 'agree[d] on all points that require negotiation,' but have not yet memorialized the agreement in

25

final form; and agreements that leave some major terms open for negotiation, in which the parties commit simply to negotiate in good faith to create a final contract." *Castle Creek Tech. Partners, LLC v. CellPoint Inc.*, No. 02 Civ. 6662 (GEL), 2002 WL 31958696, at *5 (S.D.N.Y. Dec. 9, 2002) (citing *Adjustrite Sys., Inc. v. Gab Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)). As a general matter, "parties are free to enter into a binding contract without memorializing their agreement in a fully executed document." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

The key in determining which type of preliminary agreement has been created is "the intent of the parties: whether the parties intended to be bound, and if so, to what extent," as demonstrated by "the language of the contract, and the words and deeds of the parties." *Id.* (citing *Adjustrite Sys., Inc.*, 145 F.3d at 548-49); *see also Teachers Ins. and Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) ("Courts must be particularly careful to avoid imposing liability where binding obligation was not intended."). The intent to be bound is evidenced in the following factors: "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in

26

final form, as indicated by the customary form of such transactions." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989) (citing *Tribune Co.*, 670 F. Supp. at 499–503).

As to the first type of preliminary agreement, it "occurs when the parties have reached complete agreement . . . on all the issues perceived to require negotiation." *Tribune Co.*, 670 F. Supp. at 498. This type of agreement is "preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Id.* However, "[a] purported contract that leaves the compensation term to be determined by future negotiations is 'a mere agreement to agree,' and under New York law is deemed too indefinite to be enforceable." *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 840 (2d Cir. 1993) (citing *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541, 543 (1981)). "[P]rice is an essential ingredient of every contract for the rendering of services," such that "an agreement must be definite as to compensation." *Cooper Square Realty, Inc. v. A.R.S. Mgmt., Ltd.*, 181 A.D.2d 551, 551, 581 N.Y.S.2d 50 (1st Dep't 1992).

Here, Plaintiff alleges that the parties reached a binding oral agreement "for at least the amount of [Dutt's] then current annual salary of $280,000." Am. Compl. ¶ 112. Absent allegations of further specificity as to the "essential ingredient" of compensation, Plaintiff has failed to allege a type one preliminary agreement.

The second type of preliminary agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternative objective within the agreed framework." *Tribune Co.*, 670 F. Supp. at 498 ("[T]he parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement."). The obligation that flows from this second type of agreement "bar[s] a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary conditions." *Id.*

Plaintiff has plausibly pled that Defendants had an obligation to negotiate the contract in good faith, and that this obligation was violated. Overall, the *Tribune* factors for

determining the parties' intent to contract weighs in favor of finding a preliminary agreement here. The first factor "looks to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities." *Tribune Co.*, 670 F. Supp. at 499. Plaintiff alleges that Contos "made an offer to Dutt of continued guaranteed employment for two years as CFO and Executive Vice President . . . for more money," and that Dutt "immediately accepted the offer." Am. Compl. ¶¶ 106-07. Nowhere in the Amended Complaint does the Plaintiff allege facts suggesting that Defendants sought not to be bound until the conclusion of a fully drafted agreement. *See id.* ¶ 109.

Second, the context of the negotiations further reinforces the conclusion that Plaintiff has plausibly alleged a preliminary agreement. Specifically, the OMIG Letter shows that negotiations were ongoing, with agreement expected at some point in the future: "YAI specifically advised OMIG that it was developing retention agreements to offer three of its senior executives who had such long-standing operational and programmatic experience," and that the executives "would be guaranteed employment for a fixed term, subject to traditional bases for termination for cause." *Id.* ¶ 106. This contract offer was reflected in writing, in the November 23, 2015 OMIG Letter,

signed by YAI's attorneys, and sent to OMIG. *Id.* ¶ 109. This factor strongly supports the theory that YAI was serious when it extended the employment offer to Dutt.

The third factor relates to the existence of open terms in the alleged contract. Here, the start date of the new employment contract as well as the salary figure are material elements of the agreement to which there was no final meeting of the minds. However, "[t]o consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced," and this "is not the law." *Tribune Co.*, 670 F. Supp. at 499. Rather, "[w]here the parties have manifested intention to make a binding agreement, the mere fact of open terms will not permit them to disavow it." *Id.* at 502.

The fourth factor, whether either party partially performed on the agreement, does not pertain to the present facts. The fifth and final factor is "whether the settlement agreement terms are sufficiently complex or involve long time periods, such that there should be a formal writing." *Grgurev v. Licul*, No. 15 Civ. 9805 (GHW), 2016 WL 6652741, at *7 (S.D.N.Y. Nov. 10, 2016). Courts in this Circuit traditionally consider this factor by looking to whether the agreement was either

memorialized in writing or the terms were announced in open court, neither of which have occurred here. Thus, this factor weighs against finding a binding agreement.

As the Second Circuit has noted, "courts must enforce and preserve agreements that were intended to be binding, despite a need for further documentation or further negotiation, for it is the aim of contract law to gratify, not to defeat, expectations." *Adjustrite Sys., Inc.*, 145 F.3d at 548 (citing *Tribune Co.*, 670 F. Supp. at 498) (alterations and internal quotation marks omitted). Based on the above considerations, Plaintiff has adequately alleged that Defendants had an obligation to negotiate his employment agreement in good faith sufficient to withstand this motion to dismiss.

## d. The Defendants' Motion to Dismiss Plaintiff's Tortious Interference Claim is Denied

Plaintiff alleges that Contos, by his actions, intentionally interfered with Dutt's promised contract and his continued employment with YAI pursuant to that contract. Am. Compl. ¶¶ 118-120. Contos contends that Plaintiff's tortious interference claim fails because Plaintiff has not sufficiently

31

alleged a valid enforceable contract, and because Contos may not be sued individually. Defs.' Br. 9.

Pursuant to New York law, "the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001). However, an at-will employee can bring a claim against a co-employee for tortious interference with his employment relationship with his employer upon establishing only that a "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice." *Id.* (citing *Cohen v. Davis*, 926 F. Supp. 399, 403 (S.D.N.Y. 1996) (internal citation omitted)). To demonstrate that a defendant is a "third party" to an employment contract, "a plaintiff must show that the defendant-employee has exceeded the bounds of his or her authority." *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996). In such a case, there is no "valid contract" requirement. *Albert*, 239 F.3d at 274.

Here, Plaintiff has alleged that Contos retaliated
against Dutt, refused to provide Dutt with any written
documentation memorializing the promised contract and refused to
continue negotiations in order to reach a final agreement. Am.
Compl. ¶ 121. Moreover, Dutt alleged that his termination by
Contos was motivated by malice resulting from Dutt's
participation in the Group, his refusal to accept the hush
money, and his status as an older, Indian male. *Id.* Accordingly,
Plaintiff has sufficiently alleged a claim for tortious
interference, and Defendants' motion is denied.

## V.  Conclusion

The motion of the Defendants to dismiss the first,
second, seventh, and eighth causes of action is granted in part,
and denied in part as set forth above. The Plaintiff is granted
leave to replead within 20 days.

It is so ordered.

**New York, NY**
**June 26 , 2018**

ROBERT W. SWEET
**U.S.D.J.**

33